E-FILED
Tuesday, 17 August, 2021  11:32:13 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

GREGORY T. HENSELER,         )
                                      )
          Plaintiff,       )
                                      )
       v.                )     Case No. 18-cv-1363-JES-JEH
                                      )
COOK CANTON, LLC,           )
                                      )
         Defendant.    )

## ORDER AND OPINION

This matter is now before the Court on Defendant's Motion (Doc. 51) for Summary Judgment. For the reasons set forth below, the Motion (Doc. 51) is granted.

### BACKGROUND

The following facts are culled from Defendant's statement of material facts not in dispute. Because Plaintiff failed to timely file a complete Response to Defendant's Motion, despite multiple extensions of time and warnings from the Court, the Court deems each statement in Defendant's Motion as undisputed.

Mr. Henseler is male and is of the Catholic faith. Mr. Henseler began his employment at Cook Canton on or about August 2, 2010 as an assembler in the Catheter Production Department. As an assembler, Mr. Henseler was responsible for producing catheters by using specialized equipment. At the time Mr. Henseler began his employment, Shawn Lawrence was the General Manager of Cook Canton. She held that position until mid-2016 when she left her employment with Cook Canton and transferred to a facility in Ellettsville, Indiana. When Mr. Henseler began his employment, Cook Canton provided him copies of the Employee Manual and the Employee Code of Conduct. Mr. Henseler signed written acknowledgments stating that he had received and

would familiarize himself with the policies contained within the Employee Manual and the

Employee Code of Conduct. Cook Canton updates its Employee Manual and Code of Conduct

from time to time and provides the new versions to its employees once the updates are finalized.

Mr. Henseler signed an acknowledgment on January 12, 2017, stating that he received a copy of

the revised January 2017 version of the Employee Manual and agreeing that he would read and

familiarize himself with the provisions of the Employee Manual. Mr. Henseler signed a similar

acknowledgment with respect to the January 2011 version of the Code of Conduct on July 8,

2011. The January 2017 version of the Employee Manual contains a "Behavior of Employees"

policy that states:

> Certain rules and regulations regarding employee behavior are necessary for the
> efficient operation of the company and for the benefit and safety of all employees.
> Conduct that interferes with operations, is offensive to customers or prevents fellow
> employees from performing their jobs will not be tolerated. Moreover, many
> employees are unsuccessful in their jobs due to improper behavior and conduct as
> opposed to poor job skills or performance. All employees are expected to conduct
> themselves in a manner that it conducive to the efficient operation of the company.

In addition, the January 2017 version of the Employee Manual contains a "Zero-

Tolerance Workplace Violence" policy that states in relevant part:

> Cook expressly prohibits any acts or threats of violence by any employee against
> any other employee on or off company premises at any time. Any employee who
> engages in any threatening behavior or acts of violence or who uses any obscene,
> abusive, or threatening language or gestures will be subject to immediate
> disciplinary action, up to and including termination.

The January 2011 version of the Code of Conduct requires employees to, among other

things, "[t]reat each other with respect and common courtesy," [p]rotect each other from

inappropriate behavior or treatment without fear of retaliation," and not to "tolerate workplace

violence, harassment or discrimination."

2

**Henseler's Conduct Towards Employees and the Termination of his Employment**

On November 5, 2012, Ms. Lawrence promoted Mr. Henseler to a group leader in the Hubbing Department based upon the quality of his work performance. The Hubbing Department was a newer department developed as part of the Catheter Production Department. Mr. Henseler's direct supervisor while he was a group leader was Christina Kinnamon, who was the Production Supervisor at that time. After Mr. Henseler was promoted to group leader, Ms. Lawrence, Ms. Kinnamon, and other members of Cook Canton's management team began receiving complaints from other Hubbing Department employees regarding Mr. Henseler's hostile, aggressive, and inappropriate conduct towards them.

Specifically, several of his direct reports complained that Mr. Henseler would yell at them, engage in name-calling, and berate them for things that he said were "against his religious beliefs." For example, an employee reported to Ms. Lawrence that Mr. Henseler yelled at her for asking him if he wanted to sign a wedding congratulatory card for another employee. The employee reported that she had bought a card for an openly gay co-worker who had recently gotten married. When Mr. Henseler was asked to sign the card, he started yelling at her, stating: "I can't believe you signed that gay marriage card; how can you condone that?" The employee reported to Ms. Lawrence that Mr. Henseler's conduct and tone of voice frightened her to the point that she told Mr. Henseler that she would scribble her name from the card. The employee also reported to Ms. Lawrence that she felt emotional stress as a result of Mr. Henseler's outbursts on a number of occasions and that she felt bullied by Mr. Henseler. In response to this report, Ms. Lawrence counseled and coached Mr. Henseler regarding his behavior toward other employees and explained that he needed to treat them in a respectful manner.

Despite being coached by members of Cook Canton's management team on several occasions, Mr. Henseler continued to treat his direct reports in an aggressive and disrespectful manner. For example, on July 17, 2015, another employee, Karen Bouc, reported to Ms. Lawrence that Mr. Henseler yelled at her in response to a question about a work-related anniversary gift. Cook Canton provides its employees the option to select one of several gifts to commemorate certain milestone anniversaries, including the five-year anniversary. Ms. Bouc had asked him which gift he was planning to select for his five-year work anniversary. Ms. Bouc reported that, in response, Mr. Henseler had an outburst and yelled at her that he "did not care about material things" and that "faith and family" was all he needed. Ms. Bouc also reported that Mr. Henseler made negative comments about Cook Canton's management team and that he would make other co-workers feel uncomfortable by repeatedly discussing his personal religious beliefs and calling his co-workers "sinners."

In response to Ms. Bouc's report, Ms. Lawrence and Denise Kirgan, who was the Human Resources Manager at this time, met with Mr. Henseler and explained to him that, as a group leader, he should act in a courteous and respectful manner with other employees and should refrain from having conversations with other employees about them being sinners. Ms. Lawrence explained further that some of his comments regarding his religious beliefs have made other employees feel uncomfortable, especially if they do not share his beliefs. Significantly, Ms. Lawrence also told Mr. Henseler that, even if he knows who might have reported his behavior, he was strictly prohibited from retaliating against other employees in any way.

The very next morning, on July 16, 2015, another employee reported to Ms. Kinnamon that Mr. Henseler had retaliated against Ms. Bouc. Specifically, the employee reported that Mr. Henseler manipulated paperwork prepared by Ms. Bouc in an attempt to get her in trouble at

4

work and that he had said that he was going to "get [her] back." In addition, Ms. Bouc reported directly to Ms. Kinnamon that Mr. Henseler had confronted her about reporting his conduct. In response, Ms. Lawrence and Ms. Kinnamon met with Mr. Henseler. During this meeting, Mr. Henseler admitted that he confronted Ms. Bouc. Ms. Lawrence explained to Mr. Henseler that he had defied her instructions not to retaliate against any of the employees who had reported his conduct and that his behavior would not be tolerated any further.

As a result of Mr. Henseler's retaliatory actions and his clear disregard of Ms.Lawrence's directives to him, she issued him a formal written warning and demoted him from group leader. Ms. Lawrence's decision to issue the disciplinary notice and demote Mr. Henseler was based on his insubordination and the complaints she received from his direct reports, and was not in any way based on his gender or religious beliefs. Despite receiving a formal written warning and being demoted, the Cook Canton management team continued to receive reports from Mr. Henseler's co-workers on a frequent basis that he treated them in an aggressive and inappropriate manner. For example, co-workers reported to Ms. Kinnamon that they felt as if they had to "walk on egg shells" while working to keep Mr. Henseler from having an outburst and were "scared" of him. Several of Mr. Henseler's co-workers reported to Ms. Kirgan, who replaced Ms. Lawrence as General Manager in May 2016, that he engaged in "mean talk," called his co-workers names, and made them feel uncomfortable. In addition, one employee resigned from her employment and reported to Ms. Kinnamon that she was did so because of the way Mr. Henseler treated her and the stress his conduct caused her in the workplace. Ms. Kinnamon continued to coach Mr. Henseler on his conduct and explain to him that he needed to treat his co-workers in a more respectful manner. Mr. Henseler would sometimes respond by telling Ms. Kinnamon that his co-

workers simply did not like him. Ms. Kinnamon told Mr. Henseler that he should focus on doing his job and avoid engaging in heated discussions with his co-workers.

On March 21, 2017, after informally coaching Mr. Henseler on several occasions, Ms. Kinnamon issued Mr. Henseler a written disciplinary notice for disruptive behavior. Ms. Kinnamon issued the disciplinary notice after several of Mr. Henseler's coworkers reported to her that he continued to talk to them in an aggressive and rude manner and that his conduct caused them to have a stressful work environment. Ms. Kinnamon's decision to issue the disciplinary notice was based solely on these reports from Mr. Henseler's co-workers, and was not in any way based on his gender or religious beliefs. A couple of days later, one of Mr. Henseler's co-workers reported to Kacy Brooks, who had replaced Ms. Kirgan as Human Resources Manager when she was promoted to General Manager, that Mr. Henseler continued to engage in aggressive conduct. As a result of that complaint, Ms. Brooks and Ms. Kirgan decided to conduct an investigation.

On March 23, 2017, Ms. Kirgan and Ms. Brooks notified Mr. Henseler that they had initiated an investigation and that he was being suspended until the investigation concluded. The decision to suspend Mr. Henseler was based upon the nature of the reports that they had received from his co-workers and their belief that Mr. Henseler may retaliate against others in the event he learned the identities of the employees interviewed during the course of the investigation. The decision to suspend Mr. Henseler was not based in any way on his gender or religious beliefs. During the investigation, Ms. Brooks met with three employees in an attempt to learn more about Mr. Henseler's conduct in the workplace. The employees reported that Mr. Henseler called one employee's openly gay son a "pickle licker" and a "fag," referred to employees as being "stupid," called one employee a "fat b*tch," a "c*nt," and a "fat heifer," referred to three

employees as the "white trash triangle," and said negative things about employees on a daily basis. One of the employees reported that Mr. Henseler is a bully and that she was not able to function at work due to the emotional stress that his outbursts caused her. The employees also reported that employees within his department generally try to avoid Mr. Henseler and that they at times fear for their safety. On March 24, 2017, after Ms. Brooks concluded the interviews, she and Ms. Kirgan called Mr. Henseler to summarize what they had learned during the investigation and to provide him with an opportunity to respond.

After Ms. Brooks and Ms. Kirgan explained to Mr. Henseler the types of conduct that had been reported, Mr. Henseler stated that he does not know why his co-workers do not like him and that "they are just jealous of what I have and who I am." Mr. Henseler further stated that he felt like he was being "ganged up" on by his co-workers, but agreed that at times he would become upset and agitated. At the end of their phone conversation, Ms. Brooks and Ms. Kirgan told him that he would remain on suspension until the investigation was completed. Over the next couple of days, Ms. Kirgan and Ms. Brooks had discussions with Greg Smith, the Director of Global Human Resources of Cook Group Inc., the parent company of Cook Canton, regarding their investigation of Mr. Henseler's inappropriate treatment of and conduct toward his co-workers. During these discussions, they never once talked about Mr. Henseler's male gender or his religious beliefs. Based upon the investigation, including the employee interviews and review of all relevant records, Ms. Kirgan, Ms. Brooks, and Mr. Smith determined that Mr. Henseler's conduct was negatively impacting the workplace for other Cook Canton employees and that, as a result, he had violated Cook Canton's Code of Conduct and the Workplace Violence and Employee Behavior policies within the Employee Manual.

As a result of his policy violations, Ms. Kirgan, Ms. Brooks, and Mr. Smith collectively decided to terminate Mr. Henseler's employment. On March 28, 2017, Ms. Kirgan and Ms. Brooks called Mr. Henseler to inform him that his employment was being terminated as a result of the reports they received regarding his hostile and intimidating behavior towards his co-workers. In response, Mr. Henseler stated: "Don't think we're through yet; you might be through talking to me, but we're not done here." As a result of those comments and the reports that Cook Canton had received from other employees regarding Mr. Henseler's temper and outbursts throughout his employment, Ms. Kirgan and Ms. Brooks feared retaliation from Mr. Henseler. As a result, they engaged a private security company to patrol the grounds for two weeks.

**Mr. Henseler's Alleged Comparator.**

Cook Canton hired Zelda Schenck, a female, on February 1, 2010 as an assembler in the Catheter Production Department. Shortly after beginning her employment, Ms. Schenck took on trainer responsibilities that included training new employees in her department. Ms. Schenck was promoted to a group leader in 2014 and to Supervisor on January 12, 2017. In April 2017, the Vice President of Diversity and Inclusion of Cook Group Inc. interviewed several employees at Cook Canton and learned that some of those employees were unhappy with their work environment, and specifically, that Ms. Schenck did not treat them respectfully.

Based on the reports from other employees regarding Ms. Schenck's conduct, Ms. Kirgan met with Ms. Scheck and decided to remove her from her supervisory role on May 3, 2017. At that time, Ms. Schenck was transitioned to a non-supervisory inspection role in the Catheter Production Department until July 26, 2017 when she was moved back into her original position with Cook Canton as an assembler. Ms. Schenck still holds her position as an assembler at Cook Canton today. Since her demotion in May 2017, Ms. Schenck has greatly improved her

relationships with co-workers, and there have been no further complaints from her co-workers regarding her conduct.

**Mr. Henseler's Lawsuit and Claims of Discrimination.**

On August 7, 2017, Mr. Henseler filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission ("EEOC") alleging that Cook Canton discriminated against him on the basis of his gender and religious beliefs. On July 23, 2018, the EEOC issued a Notice of Right to Sue to Mr. Henseler. On October 4, 2018, Mr. Henseler filed this lawsuit alleging that Cook Canton terminated him because of his gender and religious beliefs. During his deposition, Mr. Henseler clarified that his allegations of religious discrimination are directed solely against Ms. Lawrence. Mr. Henseler also clarified that he does not think that Ms. Brooks took any adverse action against him as a result of his gender or religious beliefs. Mr. Henseler also clarified that he did not know Mr. Smith and, therefore, did not know whether Mr. Smith's decision to terminate his employment was based on his gender or religious beliefs. He further clarified that his beliefs that Ms. Kirgan wanted to terminate him because he is a man and because of his religious beliefs are based solely on his own speculation.

LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material

9

dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as the material facts,' summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. Thus, in order to overcome the undisputed facts set forth in a defendants' motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

## DISCUSSION

Because Plaintiff has abandoned his religious discrimination claim, the sole remaining claim before the Court is Plaintiff's Title VII sex discrimination claim. *See* Doc. 58, at 13 (¶ 53). Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin …." 42 U.S.C § 2000e-2(a). Under the *McDonnell Douglas* burden-shifting approach to analyzing employment discrimination claims, "the plaintiff has the initial burden of establishing that (1) she is a member of a protected class,

(2) she performed reasonably on the job in accord with her employer['s] legitimate expectations,

(3) despite her reasonable performance, she was subjected to an adverse employment action, and

(4) similarly situated employees outside of her protected class were treated more favorably by

the employer." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir.

2017) (internal citations omitted). If the plaintiff meets that *prima facie* showing, the burden then

shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse

employment action. *Id*. If the employer articulates a legitimate, nondiscriminatory reason for the

action, the burden then shifts back to the plaintiff to show the employer's explanation is

pretextual. *Id*.

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit clarified that the correct legal

standard "is simply whether the evidence would permit a reasonable factfinder to conclude that

the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or

other adverse employment action." 834 F.3d 760, 765 (7th Cir. 2016). "The evidence must be

considered as a whole, rather than asking whether any particular piece of evidence proves the

case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id*.

While *Ortiz* did not alter the *McDonnell Douglas* burden-shifting framework, "it is not the only

way to assess circumstantial evidence of discrimination." *David*, 846 F.3d at 224 (internal

citations omitted) ("In adjudicating a summary judgment motion, the question remains: has the

non-moving party produced sufficient evidence to support a jury verdict of intentional

discrimination?"). "Because the *McDonnell Douglas* framework survived *Ortiz*," and because

Plaintiff does not attempt to identify any legal authority or legal argument in support of his

claim,[1] the Court will first analyze whether Plaintiff has established a *prima facie* case of

---

[1] *See* Plaintiff's Response, Doc. 58 at 18–22 (containing not a single citation to statute or case law).

discrimination under that approach. See *David*, 846 F.3d at 224. Thereafter, the Court will "assess cumulatively all the evidence presented by [Henseler] to determine whether it permits a reasonable factfinder to determine that" he would have not have been terminated had he been a woman, and everything else remained the same. *Id*.

In its Motion, Defendant argues Plaintiff has failed to establish a prima facie case of discrimination based on his gender. Doc. 51 at 20–23. First, Defendant asserts it is undisputed that Plaintiff was not meeting Defendant's legitimate performance expectations. Doc. 51 at 20. Specifically, Defendant argues Plaintiff was coached, disciplined, and ultimately terminated for his hostile conduct towards co-workers and his failure to abide by Cook Canton's Behavior and Workplace Violence policies and its Code of Conduct. The undisputed facts support Defendant's position. Plaintiff failed to meet his employer's legitimate performance expectations because he called peers and subordinates names, yelled at them, made homophobic slurs directed towards a co-worker's family member, and defied express instructions to cease retaliating against complaining co-workers. Based on these undisputed facts, Plaintiff has failed to establish he was meeting his employer's legitimate performance expectations.

Defendant also argues Plaintiff fails to identify a similarly situated employee who was treated more favorably than Plaintiff. Doc. 51 at 21. Plaintiff points to Zelda Schenck as a comparable employee. Schenck was disciplined in 2017 for not treating employees respectfully. After removing her from her supervisory role, Schenck improved her relationships with employees and has not received any further complaints from co-workers regarding her conduct. In contrast, when Plaintiff was disciplined, he defied express instructions to cease retaliating against complaining co-workers. Thus, Schenck is not comparable to Plaintiff because unlike Plaintiff, Schenck stopped her improper conduct after she was disciplined for it; Plaintiff, on the

other hand, persisted. Accordingly, the Court agrees with Defendant that Plaintiff has failed to identify any similarly situated employee who was treated more favorably than Plaintiff.

Defendant also asserts Plaintiff lacks any evidence to support an inference that Defendant's reason for terminating him was pretextual. Doc. 51 at 23. It appears the only evidence Plaintiff was able to marshal on this issue was a single statement from Diana Taft that "Cook was a company of females run for females." Doc. 73 at 10. However, it is undisputed that Ms. Taft was not a decision maker with regard to Plaintiff's termination. Because this remark was not made by a decisionmaker, it does nothing to establish pretext. *Petts v. Rockledge Funiture LLC*, 534 F.3d 715, 721 (7th Cir. 2008).

In sum, Plaintiff has failed to produce evidence that he was meeting his employer's legitimate performance expectations, has failed to identify any similarly situated person treated more favorable than himself, and failed to produce evidence that Defendant's justification for his termination was pretextual. Whether assessed under the *McDonnell Douglas* burden-shifting approach or the holistic approach set forth in *Ortiz*, Plaintiff is unable to meet his burden at summary judgment to show a reasonable fact finder could conclude that Plaintiff's sex caused his termination.

The two pages Plaintiff's counsel devotes to the argument section of his Response do not alter this outcome. First, Plaintiff's counsel does not address Defendant's arguments, refer to statutes or case law, or cite to evidence in the record. Rather, he has compiled a sloppy stream-of-consciousness Response, littered with typographical errors and flowing freely from first to third person narratives. Despite prior admonitions in the very case giving rise to counsel's professional discipline, counsel once again ignores every element of his claim save for pretext. *See McMahon v. Dunlap School Dist.*, No. 15-1269 ECF Doc. 21 at 12–13 (noting that "Plaintiff's argument

begins and ends with the issue of pretext, which only comes into play after the plaintiff establishes a *prima facie* case and the defendant articulates a nondiscriminatory reason for the action…. Plaintiff's response does not attempt to articulate a *prima facie* case or respond to the Defendants' legal arguments to the contrary[.]"). Further, despite voluntarily dropping his religious discrimination claim, Plaintiff's argument section appears largely dedicated to that issue. Although likely to fall upon deaf ears, the Court once again admonishes Plaintiff's counsel to perform his duties in a professional and ethical manner. This includes adhering to deadlines, obtaining (or using) a Westlaw or Lexis subscription so he may research and cite to relevant statutes and case law, addressing opposing counsel's summary judgment arguments, and performing even a cursory proof-read of his filing before submitting it to the Court. Further, if Plaintiff's counsel wishes to learn how to submit (non-scanned) PDF documents so his filings will not exceed the size limitations of ECF, he may contact the Clerk's Office for instructions on how to do so.

## CONCLUSION

For the reasons set forth above, Defendant's Motion (Doc. 51) for Summary Judgment is granted. Pursuant to this Court's February 25, 2021 Text Order, Plaintiff's counsel is directed to file an affidavit with the Court within 3 days from entry of judgment confirming he has communicated with his client regarding the outcome of his case. The Clerk is directed to close the case.

Signed on this 17th day of August, 2021.

s/ James E. Shadid
James E. Shadid
United States District Judge

14